UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD TOWNSEND,

               Plaintiff,

                              Case No.  4:14-CV-10411

v.                           Judge Terrence G. Berg
                              Magistrate Judge Anthony P. Patti

KAREN RHODES,
VICKI CARLSON,
LINDA HAASE and
MARCIA O'CONNELL,

               Defendants.

_____/

## REPORT AND RECOMMENDATION REGARDING DEFENDANT RHODES'S JULY 28, 2015 MOTION FOR SUMMARY JUDGMENT (DE 59)

**I.**    **RECOMMENDATION**:  The Court should grant Defendant Rhodes's July 28, 2015 motion for summary judgment.  (DE 59.)

**II.**    **REPORT:**

      **A.**    **Background**

      Plaintiff Richard Townsend (#181420) is currently incarcerated at the MDOC's Gus Harrison Correctional Facility (ARF).  (DE 102.)  On January 27, 2014, while incarcerated at the G. Robert Cotton Correctional Facility (JCF), Plaintiff filed the instant lawsuit against Defendants Rhodes, Carlson, Haase and

1

O'Connell, as well as Defendants John Does 1-4.  (DE 1 ¶¶ 25-28; *see also* DE 27.)

On April 13, 2015, the John Doe Defendants were dismissed.  (DE 45.) Then, on September 28, 2015, Defendants Carlson, Haase and O'Connell's motion for summary judgment was granted.  (DEs 28, 85.)  Thus, the only remaining defendant is Rhodes.[1]

### B.    Instant Motion

Currently before the Court is Defendant Rhodes's July 28, 2015 motion for summary judgment, which presents the sole argument that Defendant Rhodes did not violate Plaintiff's Eighth Amendment rights.  (DE 59 at 8, 26-30.)  Along with her motion, Defendant Rhodes filed under seal more than 800 pages of Plaintiff's medical records.  (DE 61.)[2]

Plaintiff's response was originally due on September 9, 2015.  (DE 71.)  The Court later extended the due date for Plaintiff's response to October 19, 2015.

---

[1] Although this Court granted Plaintiff's motion to correct mistake - to clarify that he is a type I insulin dependent diabetic who requires insulin three (3) times daily (*see* DEs 42, 49) - Plaintiff's other attempts to amend or supplement his complaint have been unsuccessful.  (DEs 37, 41, 65, 83.)  Moreover, on November 4, 2015, this Court denied Plaintiff's motions for immediate preliminary injunctions and restraining orders.  (DEs 57, 63, 93.)

[2] On August 5, 2015, the Court granted Defendant's motion to seal documents. (DEs 60, 68.)

(DEs 75, 79.)  Thereafter, the Court again extended the due date for Plaintiff's response, this time to November 16, 2015.  (DEs 87, 88.)

Plaintiff filed a response on November 23, 2015.  (DE 98.)[3]  Defendant Rhodes filed a reply on December 2, 2015.  (DE 99.)   Thereafter, Plaintiff attempted to file a 9 page sur-reply brief, a 10 page supplementary affidavit, and 17 additional exhibits.  (*See* DE 101.)  However, these have been stricken for the reasons set forth in my order of February 2, 2016.  (DE 104.)  The motion, response and reply, of which this motion record is comprised, are unusually fact intensive, and, accordingly, my analysis here will necessarily be quite detailed with respect to the medical record at issue.

### C.    Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The Court "views the evidence, all facts, and any inferences that may be drawn from the facts

---

[3] Throughout Plaintiff's response, he refers to unattached MDOC prisoner grievances; however, exhaustion is not an issue in Defendant Rhodes's pending motion for summary judgment.  Therefore, the Court does not find the absence of Plaintiff's grievance forms a bar to the disposition of the pending dispositive motion.

in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (internal citations omitted).

"The moving party has the initial burden of proving that no genuine issue of material fact exists . . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); cf. Fed. R. Civ. P. 56 (e)(2) (providing that if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for the purposes of the motion."). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citations omitted).

4

Summary judgment is appropriate if the evidence favoring the nonmoving party is merely colorable or is not significantly probative. *City Management Corp. v. United States Chem. Co.*, 43 F.3d 244, 254 (6th Cir. 1994). In other words, summary judgment is appropriate when "a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case. . . ." *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

### D.  Discussion

#### 1.  Plaintiff's claims against Karen M. Rhodes, D.O., are largely based upon her insulin prescriptions for treatment of Plaintiff's diabetes.

It is undisputed that Plaintiff received medical care from Dr. Rhodes while Plaintiff was incarcerated at JCF. (DE 1 ¶¶ 2, 25, DE 25 ¶¶ 2, 25.) The facts underlying Plaintiff's complaint span the period of January 12, 2011 and through January 17, 2014. (DE 1 ¶¶ 3-16, 21-22, 29.) The medical records and treatment history are painstakingly set forth in a 13 page summary provided by Defendant (DE 59 at 11-23) and in a 22 page affidavit provided by Plaintiff (DE 98 at 4-25). These 35 combined pages of summarization cover 822 pages of medical records. (DE 61 at 2 – DE 61-5 at 47.) All of this material is submitted to the Court in the context of an allegation that Dr. Rhodes was "deliberately indifferent" to Plaintiff's medical needs. In order to evaluate this claim, the Court must consider this

history, so as to have the "forest emerge from the trees." In an effort to distill this picture to manageably evaluate this claim of indifference, the following 10-page chronological synopsis emerges:

### *From October 2010 to May 2013, Plaintiff was prescribed Humulin insulins.*

- From October 22, 2010 – October 25, 2010, Plaintiff was admitted to Duane L. Waters Health Center for insulin overdose/hyperglycemia. (DE 61 at 24, 25-26, 30-31.) These records indicate an allergy to Azithromycin. (DE 61 at 25, 30; *see also* DE 61 at 27.) On October 25, 2010, Dr. Cohen prescribed, among other things, Humalog, Humulin 70-30 and Hydrochlorothiazide (a diuretic). (DE 61 at 44.)

- On January 12, 2011, Plaintiff's prescription for Humulin 70/30 was stopped and Humulin N was ordered by Young S. Kim, M.D. (DE 61 at 48.)[4] In contrast, Plaintiff's complaint contends he informed *Dr. Rhodes* on or about this date that "he was having allergic reactions to the Humulin Insulins." (*See* DE 1 ¶ 3.)

- On January 31, 2011, Dr. Kim prescribed Humulin N, and also prescribed Neurontin and Naprosyn for diabetes mellitus (DM) neuropathy. (DE 61 at 50.)

- On May 26, 2011, Plaintiff saw Karen M. Rhodes, D.O., for a chronic care visit. She continued his present medications, except she increased his Norvasc for hypertension (htn) control. (DE 61 at 75-77.)

- On June 7, 2011, Dr. Rhodes ordered NPH, Human Insulin Isophane. (DE 61 at 81.)

- On September 27, 2011, Dr. Rhodes stopped the prescription for Humalog and started a prescription for Humulin R. (DE 61 at 95.)

---

[4] With respect to Dr. Kim's January 12, 2011 change of his prescription from Humulin 70/30 to Humulin N (DE 61 at 48), Plaintiff contends Dr. Kim did not inform him; therefore, "[t]here is a real possibility [P]laintiff had allergic reactions to the Humulin Insulin and did not know it." (DE 98 at 16 ¶ 39.)

- On or about October 15, 2011, Plaintiff kited health care, "reporting localized reaction to insulin ie burning and swelling and would like to know lab results." (DE 61 at 105.) However, it appears he was a no show for his October 18, 2011 appointment. (DE 61 at 106.)

- On October 24, 2011, Adrianne M. Neff, P.A., prescribed, among other things, Humulin R, Humulin N and Naproxen, a non-steroidal anti-inflammatory drug (NSAID). (DE 61 at 112.)

- On December 1, 2011, Dr. Rhodes saw Plaintiff. It appears she diagnosed dermatitis and eczema; Dr. Rhodes ordered, among other things, Betamethasone Valerate for application to Plaintiff's rash. (DE 61 at 126.)

- Dr. Rhodes's December 15, 2011 notes indicate "[n]o impressive skin lesions present." (DE 61 at 144).

- Karina J. Beals, L.P.N.'s December 19, 2011 notes indicate that Plaintiff was prescribed Naproxen on December 16, 2011. (DE 61 at 145.)

- On January 5, 2012, Dr. Rhodes stopped Plaintiff's morning dose of NPH, Human Insulin Isophane, re-ordered the afternoon dose, and also re-ordered Naproxen. (DE 61-1 at 6.) On February 1, 2012, Plaintiff completed a HCRF "to start getting insulin in the AM again." (DE 61-1 at 15.) However, Dr. Rhodes's February 16, 2012 chart update indicates "no need to reinstitu[t]e AM NPH dose." (DE 61-1 at 23.)

- On March 14, 2012, Plaintiff submitted a Health Care Request Form for, among other things, "allergic reaction to medication" such as "face itching[,] dark spots, rash on back . . . ." (DE 61-1 at 44; *see also* DE 1 ¶ 4) On March 15, 2012, Dr. Rhodes "advised no soap to rash or it will get worse and spread, only use water on rash[.]" (DE 61-1 at 49; *see also* DE 1 ¶ 4.) She ordered bloodwork. (DE 61-1 at 46.) She also ordered NPH, Human Insulin Isophane, reinstating the morning dose and adjusting the afternoon dose. (DE 61-1 at 47, 50.)

- On March 29, 2012, Dr. Rhodes ordered NPH, Human Insulin Isophane. (DE 61-1 at 54.)

- On April 11, 2012, Plaintiff kited health care, reporting that "pain medication is not working and medication for rash on face isn't working[.]" (DE 61-1 at 57.)  On May 8, 2012, Plaintiff kited health care, reporting, in part:  "medication not clearing up rash on face[.]"  (DE 61-1 at 70.)

- On June 11, 2012, PA Neff prescribed Naproxen.  (DE 61-1 at 94.)

- On June 15, 2012, Plaintiff saw Dr. Rhodes, who ordered NPH, Human Insulin Isophane and Humulin R.  (DE 61-1 at 100-102.)

- On August 27, 2012, Adrianne M. Neff, P.A., explained to Plaintiff that "his 'rash' looks like minor acne to me (as I have told him before) and doesn't need specific treatment other than good hygiene."  (DE 61-1 at 122.)  In contrast, Plaintiff contends he informed Dr. Rhodes on or about this date about "his allergic reactions to Humulin NPH[,]" and "[n]o medication was prescribed."  (*See* DE 1 ¶ 5.)

- On September 27, 2012, Dr. Rhodes ordered Naprosyn; NPH, Human Insulin Isophane; and Betamethasone Valerate.  (DE 61-1 at 137.)  On October 11, 2012, Dr. Rhodes ordered NPH, Human Insulin Isophane.  (DE 61-1 at 142.)  On January 15, 2013, Dr. Rhodes ordered Humulin R.  (DE 61-2 at 11.)

- On January 22, 2013, Plaintiff completed an HCRF, in part because he had had a skin rash for over one year.  (DE 61-2 at 16.)  On January 30, 2013, Plaintiff completed an HCRF, alleging allergic reactions to insulin and adverse reactions to his blood pressure medication.  (DE 61-2 at 23.)

- On February 3, 2013, Health Care Services noted that Plaintiff "[r]efused NPH insulin, stating he is allergic to it."  He was given 4 units of regular.  (DE 61-2 at 24.)  Dr. Rhodes chart update from February 4, 2013 indicates:  "his rash has been present for a few months now, and he has refused most of his other meds for the same reason . . . ."  (DE 61-2 at 25.)

- On February 8, 2013, Plaintiff saw Dr. Rhodes, whose notes reflect:  "stopped nph because he believes it is causing his rash.  Stopped over a week ago, refuses to restart it though I have informed him the rash is eczema and labs show no lupus or other things causing rash."  (DE 61-2 at 31-32;

*see also* DE 1 ¶ 6.)  Dr. Rhodes ordered labwork, as well as Promethazine Hcl for itching and Lopressor for blood pressure.  (DE 61-2 at 29-30.)

- On February 20, 2013, Kathy L. Field, LPN, noted that Plaintiff was refusing to take his NPH insulin at the insulin line, further noting:  "He states he has a bad reaction with itching . . . ."  (DE 61-2 at 45.)  That same day, Plaintiff completed a HCRF stating that he was allergic to Humalog N and asking that it be replaced with another, long-acting insulin.  (DE 61-2 at 46.)

- On February 28, 2013, Dr. Rhodes stopped the NPH, Human Insulin Isophane and ordered Humulin 70-30.  (DE 61-2 at 49.)

- On March 8, 2013, Dr. Rhodes saw Plaintiff for a chronic care visit.  Plaintiff reported no major problem with 70/30.  She increased Plaintiff's evening dose of Humulin 70-30, ordered 5 days of hydrochlorothiazide, and apparently reinstated Chlorthalidone for blood pressure (bp), swelling.  (DE 61-2 at 54-56.)

- On April 11 and 19, 2013, Dr. Rhodes ordered Humulin 70-30.  (DE 61-2 at 64, 70.)

- On April 24, 2013, Plaintiff saw Frances I. Hinsley, R.N., who noted a wound on Plaintiff's back and described the signs and symptoms of infection as "increased warmth, increased redness, increased swelling[.]"  Tolnaflate, an antifungal cream, was given to Plaintiff for his back.  (DE 61-2 at 73.)

- On April 29, 2013, Plaintiff completed a Health Care Request Form regarding an allergic reaction to insulin.  (DE 61-2 at 78.)  This appears to be the HCRF Plaintiff refers to as "questioning why Dr. Karen Rhodes had not changed his insulin."  (DE 1 ¶ 7.)

- On April 30, 2013, he saw Adrianne M. Neff, P.A. (DE 61-2 at 79-80.) This appears to be the visit Plaintiff describes as having been with "RN Francis."[5] (DE 1 ¶ 8.)

- On May 8, 2013, Plaintiff kited that he was allergic to Humalog insulin. (DE 61-2 at 81.)[6] That same day, Dr. Rhodes noted: "no change in type of insulin ordered because he is not allergic to it[.]" (DE 61-2 at 85.) She also ordered labwork. (DE 61-2 at 83.)

### During May 2013, six months of Novolin was approved.

- On May 17, 2013, after review of Plaintiff's case with Regional Medical Director Bergman, Dr. Rhodes sought Regional Medical Officer (RMO) review and received approval from Haresh B. Pandya, M.D. for 6 months of Novolin. (*See* DE 61-2 at 96-99.) Dr. Rhodes saw Plaintiff. (DE 61-2 at 102-103.) She stopped Humulin 70-30 and ordered Novolin N. (DE 61-2 at 101.) According to Plaintiff, he had no allergic reactions. (DE 1 ¶ 10.)

- On May 18, 2013 and May 23, 2013, Plaintiff asked to be tested for allergic response to Humalog Insulin, NPH Insulin and/or 70/30, and the kites were addressed by Cindy L. Murphy, R.N., and Renyu Xue. Renyu responded: "Health care does not provide such test." (DE 61-2 at 104, 106.) The Court assumes these are the requests Plaintiff alleges were denied. (*See* DE 1 ¶ 9.)

- On May 25, June 6, June 7 and July 10, 2013, Dr. Rhodes ordered Novolin N. (DE 61-2 at 107, 113, 117, 144.)

- On July 29, 2013, Plaintiff inquired about approval for pain medication. (DE 61-2 at 152.) On August 3, 2013, Plaintiff kited that Naproxen was not helping his pain. (DE 61-3 at 2.)

---

[5] This is presumably a reference to Frances I. Hinsley, R.N., whose name appears in Plaintiff's medical records on April 16, 2013 and April 24, 2013. (*See* DE 61-2 at 68, 73-74.)

[6] In his response, Plaintiff claims he mistakenly used "Humalog" instead of "Humulin." (DE 98 at 7 ¶ 18, DE 98 at 20 ¶ 49.)

- On August 14, 2013, Dr. Rhodes ordered Cardizem La for blood pressure. (DE 61-3 at 7.)[7]

- On September 6, 2013, Plaintiff inquired about renewal of his prescriptions for Naproxen and Betamethasone.  (DE 61-3 at 22.)  On September 18, 2013, Plaintiff kited about renewal of his Naproxen prescription, as he had pain in his left arm, back of left foot and big toe.  (DE 61-3 at 28.)

- On October 19, 2013, Dr. Rhodes sought review by the Pain Management Committee (PMC).  (DE 61-3 at 41-42.)[8]

### *The October 2013 request for renewal of Novolin was deferred, and Plaintiff was again prescribed Humulin insulin.*

- On October 25, 2013, Dr. Rhodes sought RMO Review for renewal of Novolin NPH.  In part, she stated, "Though the control is not good he is at least taking the insulin regularly, which he refused to do previously.  He has been finding reasons to refuse his insulin for years, so getting him to take this regularly is a big improvement."  (DE 61-3 at 53.)  However, the request was pended on October 28, 2013 by Borgerding; he deferred the request on October 29, 2013, noting:  "Please follow for any allergic reactions. Pt. compliance is not an indication for off-formulary or DAW medications[.]"  (DE 61-3 at 54, 57.)

- On October 28, 2013, Dr. Rhodes changed Plaintiff's prescription from Novolin N to Humulin N.  (DE 61-3 at 55-56.)  Plaintiff claims this occurred without his knowledge.  (DE 1 ¶ 11.)

- On November 1, 2013, the Pain Management Committee (PMC) recommended Neurontin; Dr. Rhodes ordered it.  (DE 61-3 at 40, 61-63, 72.)

---

[7] On August 26, 2013, Dr. Rhodes sought RMO Review for Elavil, a non-formulary medication, but the request was deferred by William C. Borgerding, D.O.  (DE 61-3 at 16-17.)

[8] That same day, Dr. Rhodes sought RMO Review for Epsom salt, a non-formulary medication.  (DE 61-3 at 45.)  She also ordered the special accommodation of a bottom bunk.  (DE 61-3 at 47.)

- On November 11, 2013, Plaintiff sought an increase in his Neurontin dosage, and, on November 20, 2013, he stated Neurontin was not working. (DE 61-3 at 75, 77.)

- On November 27, 2013, Dr. Rhodes ordered NPH, Human Insulin Isophane. (DE 61-3 at 81.)

- According to Plaintiff, on or about November 30, 2013, JCF RNs notified Plaintiff his Novolin N and R prescription had been changed to Humulin N and R.  (DE 1 ¶ 12.)

- Seemingly on December 11, 2013, Plaintiff alleges that Frances I. Hinsley, R.N., and Karen R. Hamblin, R.N., stated that "Novolin N is off-formulary." (DE 1 ¶ 13.)

- On December 12, 2013, Plaintiff saw Dr. Rhodes, who reported:  "states they are giving him the wrong insulin (70/30) again and . . . he now has a rash on his back again for about the last month."  (DE 61-3 at 90.)  Dr. Rhodes "assured inmate he gets the right insulin . . . ."  She noted, "will titrate Neurontin per RMO request being sent[,]" and also ordered labwork. (DE 61-3 at 91, 89.)  According to Plaintiff, Dr. Rhodes stated, "It [is] just a little rash," and ignored the other physical adversities.  (DE 1 ¶ 14.)

- On December 13, 2013, Plaintiff kited health care regarding the issue of Humulin R versus Novolin R.  (DE 61-3 at 93.)  Dennis Lester, R.N.'s December 14, 2013 response noted, in part:  "Your chart shows that you were told by the medroom nurse that Humulin R was what was ordered and that Novolin R was not RMO approved and you accepted the Humulin R insulin despite having an alleged allergy to it as you have reported on numerous occasions."  (DE 61-3 at 94.)  Plaintiff alleges he stopped taking the Humulin N on or about this date "due to the painful allergic reactions." (DE 1 ¶ 15.)  Plaintiff's complaint *seems* to allege that JCF medical staff has not provided him with insulin since this date.  (DE 1 ¶ 21.)

- Dr. Rhodes's December 18, 2013 clinical notes indicate "Inmate came to HS insulin line and accucheck showed 468. He refused his NPH insulin as he states "he is allergic and it causes an itchy rash". He also refused to take his Regular insulin, which he has never complained about having any type of reaction with."  (DE 61-3 at 108.)

- On December 19, 2013, Plaintiff kited health care multiple times, complaining of pain (abdomen, feet, arms and legs), asking for a detail for continuous use of the bathroom and asking for an increase in his pain medication. (DE 61-3 at 109-111.) Plaintiff claims he sought an increase in his prescription for Neurontin. (DE 1 ¶ 16.) He received treatment from David Launder, P.A., at Duane L. Waters Health Center (DWH) Emergency Department, who indicated, in part, "**I discussed with the inmate in great length that it is unlikely that the medication was causing his rash, as he still has it and hasn't used the medications now in over a week.**" (DE 61-3 at 114-115 (emphasis added).) Launder noted that he spoke with Plaintiff's MSP "who states RMO will not approve it [Novolin]. I offered to order the Novalog we used here but she states she can not [sic] use it if I send it to his facility." (DE 61-3 at 122.)

- Dr. Rhodes's December 20, 2013 chart update states: "will not send RMO for incr. neurontin dose until inmate takes his insulin ( which he has been refusing), because high sugars make his neuropathy s/s worse, thus would negate any effect of increased dose." (DE 61-3 at 130-131; *see also* DE 1 ¶ 16.)

- On December 21, 2013, Plaintiff was seen at the DWH Emergency Room by Michael Adix, M.D., who noted, in part: "I recommend that the patient be placed back on Novolin R, because it doesn't cause a rash, and the patient must be on an insulin regimen that he agrees with. It is not an option for the patient's concerns about a rash secondary to Humulin R to continue to be ignored." (DE 61-3 at 135-137.)

- According to Dr. Rhodes's administrative notes, Plaintiff was evaluated by psychiatrist Dr. Weller, M.D., on December 22, 2013, and it was determined that Plaintiff was not mentally ill and "had the capacity to refuse his medication[.]" (DE 61-4 at 84.)

- On December 26, 2013, during the afternoon, Plaintiff saw Kyle L. Sperling, P.A., who noted that Plaintiff had been diagnosed with a urinary tract infection (UTI) and prescribed Cipro, a quinolone antibiotic. (DE 61-4 at 5-6.) Sperling also completed a Mental Health Services Referral. (DE 61-4 at 8.) That evening, Plaintiff saw Jennifer Wierman, N.P., who reordered the Cipro. (DE 61-4 at 12, 13-15.)

- On December 27, 2013, Plaintiff was examined by Vicki S. Carlson, R.N., who noted that Plaintiff demanded "to go to the hospital for pain and 'proper insulin . . . .'"  (DE 61-4 at 22.)[9]

- On January 4, 2014, Plaintiff kited health care, asking:  "I have been informed that Novolin N and R is off-formulary.  Is this Insulin off-formulary at all prisons?"  (DE 61-4 at 38.)

- On January 7, 2014, Plaintiff saw Wendy S. Liu, N.P., who noted Plaintiff was complaining of "increased nerve pain in his legs and wanted his Neurontin dosage increased."  (DE 61-4 at 58.)

- On January 10, 2014, Plaintiff completed a HCRF "[a]sking to be re-evaluated for the rash since he has stopped using Humulin Insulin."  (DE 61-4 at 65.)

- On January 17, 2014, Dr. Rhodes ordered, among other things, Naprosyn; NPH, Human Insulin Isophane; and Humulin R, and apparently renewed Neurontin; she also ordered the special accommodation of AM and PM Restricted Medlines.  (DE 61-4 at 81-82, 90.)  Her administrative notes from the same date indicate:  "Per review of case with Dr. Coleman (inpatient coordinator, [C]orizon), we will restrict all his meds because he is chronically noncompliant and could use those meds to get himself hospitalized.  We will shakedown his cell for all his meds."  (DE 61-4 at 84.)  This is consistent with Plaintiff's allegation that Dr. Rhodes had his pain medication (Naproxen) removed from his possession.  (DE 1 ¶ 22.)

- On January 22, 2014, Wendy S. Liu, N.P., prescribed Tolnaflate for Plaintiff.  (DE 61-4 at 103.)  They discussed the effect of increasing the dosage of Neurontin due to increased pain; she also discussed with Plaintiff "giving test dose of NPH while he remains in site of medical personnel to watch for reactions[,]" but also noted that Plaintiff declined this.  (DE 61-4 at 107.)[10]

---

[9] Plaintiff disputes Carlson's characterization of his comments.  (DE 98 at 23 ¶ 54.)

[10] Plaintiff's response characterizes Liu's suggestion differently but also notes that he took Humulin Insulin, had an allergic reaction, was sent to health care, but was "left sitting in the lobby."  (DE 98 at 11 ¶ 30; *see also* DE 98 at 23 ¶ 55.)

- On January 23, 2014, Plaintiff's blood was drawn to determine level of Neurontin.  (DE 61-4 at 115.)

***During January 2014, this lawsuit was filed, and Novolin was renewed for 1 year – to January 30, 2015.***

- On January 27, 2014 – the day the instant lawsuit was filed - Plaintiff was seen at the DWH Emergency Department by D. Robert Salmon, P.A.C. Salmon noted that Plaintiff has multiple "resolving hyperpigmented lesions on his back that he indicates are a result of taking the Humulin R and NPH[,]" and rewrote Plaintiff's prescriptions for Novolin N and R.  (DE 61-4 at 134, 138.)

- On the morning of January 30, 2014, Plaintiff was treated by David Launder, P.A., at the DWH Emergency Room.  It appears Launder spoke with a female MSP, who represented that *"the rash he reports to having is clearing after the application of an antifungal cream."*  (DE 61-4 at 155, DE 61-5 at 11 (emphasis added).)

- On the afternoon of January 30, 2014, based upon direction from RMD Bergman, Dr. Rhodes sought RMO Review for 1 year of Novolin; Borgerding approved the request.   (DE 61-5 at 9-10.)  Dr. Rhodes ordered Novolin N.  (DE 61-5 at 6.)

- On January 31, 2014, Dr. Rhodes noted that Plaintiff's Neurontin test result was low.  (DE 61-5 at 13.)

These detailed events provide the backdrop for Plaintiff's complaint, which alleges

deliberate indifference to a serious medical need in violation of the Eighth

Amendment.  (DE 1 at 6 ¶ 29.)

**2.    To succeed on his Eighth Amendment claim, Plaintiff must show deliberate indifference to a serious medical need.**

"The deliberate indifference to serious medical needs of prisoners . . . . constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013) (citing *Estelle v. Gamble,* 429 U.S. 97, 104–05 (1976)). The Court applies a two-prong test with objective and subjective components to assess claims of deliberate indifference to serious medical needs of prisoners. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). First, the plaintiff must show that the deprivation alleged is "objectively, 'sufficiently serious.'" *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Second, the plaintiff must show that the prison official committing the act did so with a "'sufficiently culpable state of mind.'" *Id.* (citing *Wilson*, 501 U.S. at 302-03). The United States Court of Appeals for the Sixth Circuit applies the test as follows:

> First, we determine whether the plaintiff had a sufficiently serious medical need under the objective prong. A medical need is sufficiently serious if it has been diagnosed by a physician that has mandated treatment or it is so obvious that even a lay person would easily recognize the need for medical treatment. Second, we determine whether the defendant had a sufficiently culpable state of mind in denying medical care under the subjective prong.

*Burgess*, 735 F. 3d at 476 (internal citations and quotations omitted).

### 3. Plaintiff has not shown that Defendant Rhodes was deliberately indifferent in her treatment of Plaintiff's diabetes, rash or pain.

In this case, the issue is not whether Plaintiff's medical needs were objectively serious. Rather, the issue here is whether Defendant Rhodes was deliberately indifferent to those needs. To succeed on the subjective prong, a plaintiff must show "more than mere negligence, but something less than specific intent to harm or knowledge that harm will result. . . ." *Id.* (citing *Farmer*, 511 U.S. at 835). Specifically, the conduct must "demonstrate deliberateness tantamount to an intent to punish." *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988). However, "a prisoner is not required to show that he [or she] was literally ignored by the staff to prove an Eighth Amendment violation, only that his [or her] serious medical needs were consciously disregarded." *Rouster v. Cnty. of Saginaw*, 749 F. 3d 437, 448 (6th Cir. 2014).

Here, Defendant Rhodes's actions do not demonstrate an intent to punish, nor does the record indicate Defendant Rhodes consciously disregarded Plaintiff's serious medical need(s), whether challenging her treatment of his diabetes, his alleged allergic reaction / skin rash, or his pain:

### a.    Diabetes

The crux of Plaintiff's complaint is that Defendant Rhodes prescribed Humulin Insulins to treat his diabetes, when he was allergic to such insulins. However, because Plaintiff's claims about insulin prescriptions allege that the Humulin was causing his rash, the Court will initially address Dr. Rhodes's

17

treatment of Plaintiff's diabetes before moving on to its consideration of her treatment of Plaintiff's rash.

Plaintiff's medical record contains several documents that evidence the monitoring of his glucose from November 2010 into August 2014. (DE 61-1 at 29-37, DE 61-5 at 14-47.)[11]  Importantly, Defendant Rhodes, a medical professional, generally attests the following about her treatment of Plaintiff's diabetes: "Mr. Townsend is not allergic to Humulin 30/30[,] Humalog, Humulin N, or Humulin R."  In her opinion, "[i]t was more important to control Mr. Townsend's diabetes than to attempt to convince him he was not allergic to Humulin." (DE 59-2 ¶ 95.) Her myriad prescriptions for Plaintiff's insulin, Humulin, Novolin, or otherwise, are illustrated above.

Among other things, Plaintiff takes issue with Dr. Rhodes's change of his prescription from Novolin to Humulin (DE 98 at 15 ¶ 37), contends that Dr. Rhodes's refusal to prescribe a different brand of insulin is motivated by cost (DE 98 at 13 ¶ 36), and that she changed his prescription from Humalog to Humulin R

---

[11] The record includes some specific notes of glucose monitoring, for example August 17, 2013 by Kathy L. Field, LPN and January 24, 2014 by Linda L. Haase, RN. (DE 61-3 at 13, DE 61-4 at 121).

on September 27, 2011 despite being aware of his complaint regarding Humulin (DE 61 at 95, DE 98 at 18 ¶ 41).[12]

However, setting aside Plaintiff's complaint that he was allergic to the Humulin insulin prescriptions, it is important to note that the decision to prescribe Novolin, or not to prescribe it, was not solely in Dr. Rhodes's hands. Defendant Rhodes's initiation of Novolin on May 17, 2013 occurred by approval of the RMO; her cessation of Novolin and replacement with Humulin in October 28, 2013 occurred in conjunction with the RMO's same-day pending and day after (October 29, 2013) deferral; and her re-initiation of Novolin on January 30, 2014 again occurred by approval of the RMO. (*See* DE 61-2 at 99-103, DE 61-3 at 54-57, DE 61-5 at 6-10.) Therefore, it cannot be said that she was deliberately indifferent to Plaintiff's serious medical needs at those times when she failed to prescribe Novolin.

To be sure, Plaintiff's complaint and response discuss being transported to Allegiance on December 24, 2013 and again on January 6, 2014 due to high blood sugar, blood and ketones in his urine. (*See* DE 1 at 4 ¶¶ 17, 19; *see also*, DE 98 at 2, 10 and 11.) However, to the extent, if at all, Plaintiff claims that Dr. Rhodes

---

[12] This Court has suggested that "the Eighth Amendment is not violated when an inmate disagrees with the type of drug prescribed, i.e., specific brand name versus generic, even if the decision is made based on cost rather than effectiveness and even if the generic drug is less effective." *Allison v. Martin*, No. 09-10099-BC, 2009 WL 2885088, at *7 (E.D. Mich. Sept. 2, 2009) (citing cases).

was not properly treating his diabetes, these visits occurred at periods of time when he was being prescribed Humulin *but had stopped taking Humulin*. (*See* DE 1 ¶ 15 (on or about December 14, 2013); *see also* DE 61-4 at 65 (January 10, 2014)). In other words, these events occurred in between the October 2013 cessation of Novolin and prescription of Humulin, and the January 30, 2014 re-introduction of Novolin. (DE 61-3 at 55-56, DE 61-5 at 6.)

Moreover, in his response to Defendant Rhodes's dispositive motion, Plaintiff claims that Dr. Rhodes's discontinuation of morning insulin on January 5, 2012, was not reasonable, because the glucose log shows his blood level was good two weeks earlier. (DE 61-1 at 6, DE 98 at 18 at 17-18 ¶ 42.) Next, he points to his February 1, 2012 HCRF, which states his morning blood sugars are 145 to 195, and Dr. Rhodes's February 16, 2012 decision not to reinstitute his morning dose. (DE 61-1 at 15, 23; DE 98 at 17 ¶ 43.)

However, Dr. Rhodes's January 5, 2012 dermatologic notes indicate that Plaintiff was negative for rash and "inmate had stopped all his pills for 2 weeks except glucophage at hs and naprosyn prn due to the rash he had, has no current rash and the cream helps it when he has it per inmate." (DE 61-1 at 7.) Her affidavit notes her interpretation of his prior two weeks' glucose log in arriving at the decision to stop his morning Humulin N dosage, regarding which I note his glucose levels from December 22, 2011 to January 5, 2012 were anywhere from 84

20

to 154.  (*See* DE 59-2 ¶ 22, DE 61-5 at 39-40.)  Moreover, her February 16, 2012 assessment observed, "INMATES GLUCOSE LOG STABLE ON ONE SHOT INSULIN A DAY, WILL DISCUSS WITH INMATE ON HIS NEXT VISIT," and "NO NEED TO REINSTITUE AM NPH DOSE."  (DE 61-1 at 23; *see also* DE 59-2 ¶ 23.)  Any debate by Plaintiff over Rhodes's opinion that his glucose was stable at this time or any question he has about the propriety of her decisions in managing his diabetes are merely differences of opinion or questions about the medical judgment Rhodes *actually rendered*, rather than *disregard* in managing his prescriptions for insulin to treat diabetes.  Moreover, they are *expert medical opinions*, which Plaintiff is not qualified to render.

As discussed in further detail below, these types of claims are insufficient to constitute deliberate indifference to a serious medical need under the Eighth Amendment.  Here, it suffices to note, as this Court has previously, that where a party complained the physician would not give him Celebrex to address pain from arthritis, but, instead, prescribed an alternate medication, "[t]his dispute concerns the plaintiff's personal satisfaction with the medical care he received, not the doctor's deliberate indifference to his serious medical needs."  *Tribe v. Englelsgjerd*, No. 00-10451, 2002 WL 31051984, *3 (E.D. Mich. Sept. 11, 2002) (Lawson, J.).  Such claims do not rise to the level of an Eighth Amendment violation.  *Tribe*, 2002 WL 31051984, *3.  Relatedly, Plaintiff responds that "Dr.

21

Rhodes ignored his complaint of allergic symptoms to Humulin insulin[,]" and "continued to prescribe me the same Humulin Brand Insulin which did not control[] my blood sugar."  (DE 98 at 13 ¶ 36.)  Yet, this general statement by a non-expert does not create a genuine issue of material fact regarding whether Humulin adequately controlled the level of sugar in Plaintiff's blood.  Moreover, although Plaintiff here points to Dr. Rhodes's attestation that "Mr. Townsend's records further show that his diabetes have been, at times, poorly controlled due to his failure to comply with his prescribed course of treatment[,]"  his statement that Humulin did not control his blood sugar is unaccompanied by a supporting citation to his medical record.  (*See* DE 98 at 13 ¶ 36.)

### b.  Alleged allergic reaction / skin rash

At the heart of Plaintiff's complaint against Defendant Rhodes is a claim that she was deliberately indifferent in treating his diabetes with Humulin, rather than Novolin.  According to Plaintiff, the Humulin caused an allergic reaction or rash.  (*See*, *i.e.*, DE 1 ¶¶ 3, 5 & 6.)  Consequently, Plaintiff challenges Dr. Rhodes's inadequate treatment of or indifference to the skin rash.

The Sixth Circuit has instructed that "[w]e distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment."  *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). "Where a prisoner has received some

medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d at 850 n.5. "Of course, in some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all." *Id*; *see also White v. Correctional Medical Services, Inc.*, 94 F.App'x 262, 264 (6th Cir. 2004) ("Although White did not receive the care he wanted, the conduct he alleged did not constitute a deliberate indifference to his medical needs.").

By his response, Plaintiff makes several observations which clearly show that he is challenging the adequacy of Dr. Rhodes's treatment of Plaintiff's rash *or* the propriety of Dr. Rhodes's failure to treat his rash as an allergy to Humulin insulin. As an initial matter, in some ways, Plaintiff disputes the medical record:

- He claims that Dr. Rhodes and JCF medical staff accused him of "lying pertaining to my complaints of allergic reactions to the Humulin Brand Insulin." (DE 98 at 7 ¶ 17.)

- As for Dr. Rhodes's May 26, 2011 notes, Plaintiff contends that Dr. Rhodes did not address his complaints regarding the itchy rash; instead, he was harassed and called a liar. (DE 61 at 75-77, DE 98 at 18 ¶ 40.)

- As to Dr. Rhodes's March 15, 2012 notes, Plaintiff contends she did not advise him that the rash could worsen and spread if he used soap and ignored his future complaints about the rash. (DE 61-1 at 49, DE 98 at 17 ¶ 44.)

Plaintiff states, in conclusory fashion, that "as one of the records keeper[s], Dr. Rhodes can place any information in [P]laintiff's medical record to substantiate her defense." (DE 98 at 12 ¶ 54.) However, this statement, alone, does not create a genuine issue of material fact regarding the accuracy of Plaintiff's medical records.

Plaintiff claims that a June 2010 allergic reaction to Humulin insulin, which Dr. Cohen observed, resulted in a prescription for hydrochlorothiazide, but that Cohen was transferred or quit before a biopsy could be performed. (DE 98 at 4-5 ¶¶ 5-6.) However, even if Plaintiff had complained in 2010 to Dr. Cohen about an allergic reaction to Humulin Insulins (DE 98 at 13 ¶ 35), Dr. Rhodes's December 15, 2011 notes indicate "[n]o impressive skin lesions present." (DE 61 at 144). As noted above, Dr. Rhodes prescribed Betamethasone Valerate in December 2011 and September 2012. In addition, Dr. Rhodes's January 5, 2012 notes indicate "has no current rash and the cream helps it when he has it per inmate." (DE 61-1 at 7.) Moreover, although from Nurse Hinsley, Plaintiff received the Tolnaflate, an antifungal, in April 2013 for his back. At best, Plaintiff argues a claim for negligent diagnosis and/or treatment; however, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

In some respects, Plaintiff takes issue with his opinions versus those of Dr. Rhodes, a medical professional.  For example, Plaintiff: claims that the failure to perform a biopsy on his rash or to test him for allergic reactions to the preservatives and ingredients[13] used to make Humulin Insulin renders unfounded Dr. Rhodes's opinion that Plaintiff is not allergic to Humulin insulin (DE 98 at 1-2, DE 98 at 8 ¶ 20, DE 98 at 14-15 ¶¶ 37-38; *see also* DE 98 at 19-20 ¶¶ 45, 50, DE 98 at 22 ¶ 52, DE 98 at 24 ¶ 56); takes issue with the fact that Dr. Rhodes is not a dermatologist (DE 98 at 12 ¶ 33); asserts that it was more important to Dr. Rhodes to convince him he was not allergic to Humulin Insulin than to control his diabetes (DE 98 at 24-25 ¶ 58);[14] states the betamethasone cream Dr. Rhodes continued to prescribe did not resolve the itching (DE 98 at 16, 18 ¶ 40); contends that Dr. Rhodes ignored his complaints about the itchy rash and continued to prescribe Betamethasone even after he informed her it did not resolve the itching (DE 98 at 6 ¶ 12, DE 98 at 18 ¶ 42); claims his itchy rash disappeared after he stopped taking

---

[13] As for Dr. Rhodes's attestation that Humulin is manufactured by Eli Lilly and Company, while Novolin is manufactured by Novo Nordisk, Plaintiff contends he "is allergic to the preservatives, ingredients used to make the Humulin Brand Insulin."  (DE 59-2 at 4 ¶ 7, DE 98 at 14 ¶ 37, DE 98 at 16 ¶ 38.)

[14] Dr. Rhodes also attests, "[w]e provided antihistamines to ally his mistaken belief he was suffering an allergic reaction to the medications."  (DE 59-2 ¶ 95.) True, the Court has not been able to substantiate Defendant Rhodes's attestation that antihistamines were provided.  However, this is not of consequence.  Launder's December 19, 2013 notes indicate, "I made the offer of using an antihistamine, i.e. Benadryl or hydroxyzine, and the patient states that he still will not use the insulin unless they change it to Novolin[,]" and Dr. Rhodes acknowledged this offer in her affidavit.  (DE 61-3 at 114, 122, DE 59-2 ¶ 72.)

Humulin NPH on February 8, 2013 (DE 98 at 6 ¶ 13); alleges that Dr. Rhodes

refused to change his insulin to one to which he is not allergic (DE 98 at 6 ¶ 16);

and claims he does not have a history of chronic skin disorder, and that his

symptoms are completely different from those of eczema.  (DE 98 at 16 ¶ 38.)

Here, I note Dr. Rhodes's release from responsibility form dated March 8, 2013,

which claims Plaintiff stated, "but I know my body so I know it is an allergy even

if the testing says otherwise[.]"  (DE 61-2 at 87.)  However, even though Plaintiff

claims he did not make this statement (DE 98 at 20 ¶ 50), it is not enough for

Plaintiff to observe that his rash "disappeared when he stopped using the Humulin

Insulin."  (DE 98 at 19 ¶ 45; *see also* DE 98 at 25 ¶ 59.)  Nor is it enough that

Plaintiff contends his continuation of Humulin R prevented the rash from

completely healing.  (DE 98 at 19-20 ¶¶ 46-47.)  Nor is it enough that Plaintiff

contests the effectiveness of the antifungal cream (Tolnaflate).  (DE 98 at 24 ¶ 57.)

These are simply disagreements with Dr. Rhodes's course of treatment.  *Anger v.

Gingell*, No. 12-14980, 2014 WL 988989, *5 (E.D. Mich. Mar. 13, 2014)

(Goldsmith, J., accepting and adopting recommendation of Whalen, M.J.) ("Mr.

Anger may disagree with Dr. Co's diagnosis and his choice of treatment, but mere

disagreement does not equate to deliberate indifference.").

        In other respects, Plaintiff takes issue with alleged differences between other

health professionals' opinions and those of Dr. Rhodes.  For example, Defendant

26

Rhodes attests that Plaintiff made erroneous reports to Launder, Adix and Salmon on December 19, 2013, December 21, 2013 and January 27, 2014, respectively; Plaintiff disputes some of these characterizations.  (*See* DE 59-2 ¶¶ 72, 76 and 91; DE 98 at 21 ¶ 51, DE 98 at 23-24 ¶ 56.)[15]  Plaintiff also points to Launder's December 19, 2013 notes, Adix's December 21, 2013 notes, and Salmon's January 27, 2014 notes as "certified medical professionals by the State of Michigan who contradict[] Dr. Rhodes' diagnoses, opinions and allegations."  (DE 98 at 2; *see also* DE 98 at 16 ¶ 38, DE 98 at 24 ¶ 56.)[16]  Similarly, Plaintiff refers to his January 30, 2014 examination with PA Launder.  (DE 98 at 8 ¶ 20(c).)  However, even if Dr. Adix and P.A. Salmon disagree with Dr. Rhodes attestation that "[a] patient would not likely develop a long term rash located away from the injection site as an allergic reaction after receiving the insulin for many years without issue[,]" (DE 59-2 at 10 ¶ 27, DE 98 at 19-20 ¶¶ 45, 50, DE 98 at 22 ¶ 52, DE 98 at 24 ¶ 56), "a § 1983 claim based on the Eighth Amendment is not present when a doctor disagrees with the professional judgment of another doctor, as there are several ways to treat illness."  *Acord v. Brown*, No. 93-2083, 1994 WL 679365, *2 (6th Cir. Dec. 5, 1994) (citing *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir.

---

[15] As Dr. Rhodes attests, "Medical professionals working in emergency rooms must rely on the history provided by the patients."  (DE 59-2 ¶ 76; *see also* DE 59-2 ¶ 91.)

[16] Here, Plaintiff also makes reference to the January 7, 2014 recommendation of Letarte Shawn, M.D., of Allegiance Hospital.  (DE 98 at 2.)

1990)); *see also Mitchell v. Hininger*, 553 F.App'x 602, 606 (6th Cir. 2014)

("Choosing one doctor-supported treatment regimen over another doctor-supported

treatment regimen does not amount to deliberate indifference.").  Moreover, the

Court cannot help but notice that Dr. Launder found that "[i]t is unlikely that the

medication was causing his rash, as he still has it and hasn't used the medications

now in over a week." (DE 61-3 at 114.)

 Lastly, I address Plaintiff's representation that Dr. Rhodes and JCF medical

staff notified, or were required to notify, DWH medical staff of Plaintiff's medical

condition before he arrived.  (DE 98 at 14-15 ¶ 37, DE 98 at 21-22 ¶ 52; *see also*

DE 61-3 at 41 (dated Oct. 19, 2013).)  As Defendant Rhodes correctly notes,

"alerting the offsite providers of Plaintiff's condition does not mean that they

reviewed several years of medical records."  (DE 99 at 5.)  Moreover, in her

affidavit, Dr. Rhodes points out that Nurse Practitioner Liu, presumably based at

JCF, did in fact speak with Physician's Assistants Salmon and Launder, each

presumably based at DWH, in conjunction with Plaintiff's January 27, 2014 and

January 30, 2014 visits to DWH.  (DE 59-2 at 31-32 ¶¶ 90-92; *see also* DE 61-4 at

140, DE 61-4 at 155, DE 61-5 at 4.)

### c. Pain management

 Over the course of his treatment, Plaintiff received prescriptions for pain.  In

his complaint, Plaintiff claims that Dr. Rhodes denied his December 2013 request

for an increase in his Neurontin prescription for neurological pain; here, Plaintiff seems to take issue with Dr. Rhodes's December 20, 2013, decision that she would not send the RMO a request for an increase in Plaintiff's Neurontin dose until he takes his insulin.  (DE 1 ¶ 16, DE 61-3 at 130.)  Plaintiff also claims that "[o]n January 17, 2014, Dr. Rhodes had Plaintiff's pain medication, (Naproxen) removed from his possession."  (DE 1 ¶ 22.)  Here, Plaintiff seems to take issue with Dr. Rhodes's January 17, 2014 decision to shakedown Plaintiff's cell for medications. (DE 61-4 at 84.)

The record does not support a conclusion that Dr. Rhodes was deliberately indifferent to Plaintiff's serious medical needs with respect to these two decisions regarding Plaintiff's pain medication.  To the contrary, on October 19, 2013 – a date prior to the two instances of which Plaintiff complains - Dr. Rhodes completed a request for consultation by the Pain Management Committee (PMC), which yielded the PMC's October 30, 2013 recommendation of Neurontin.  (*See* DE 61-3 at 40-41).  On November 1, 2013, Rhodes ordered the Neurontin.  (DE 61-3 at 63.)  As for the two instances of which Plaintiff specifically complains, Rhodes's December 20, 2013 notes explain that she would not seek approval for an increase in Neurontin until Plaintiff takes his insulin, explaining that "high sugars make his neuropathy . . . worse, thus would negate any effect of increased dose." (DE 61-3 at 130-131.)  Also, her January 17, 2014 administrative note indicates

that the decision to shakedown cell for meds was driven by her discussion with Dr. Coleman and the conclusion that Plaintiff "is chronically noncompliant and could use those meds to get himself hospitalized." (DE 61-4 at 84.) Rather than indifference, the records clearly demonstrate concern.

### d.    Conclusion

While Plaintiff complains that the "lack of insulin" caused sexual dysfunction, loss of eyesight – which has slowly returned but remains blurry, increased nerve pain in his limbs, etc. (DE 98 at 25 ¶ 60), the record contains ample warning about the consequences of refusing insulin, such as high blood glucose readings, ketones in urine, death, organ damage, etc. (*See*, *i.e.*, DE 61 at 2, 3, 18 & 43; DE 61-3 at 114 & 141; DE 61-4 at 2, 9, 19 & 107.) Indeed, the medical record also contains Dr. Rhodes's notes from three instances in 2013, when she noted that Plaintiff "refused recommended care for [his] condition." (DE 61 at 6, 8, 10.)

In sum, the record is (a) littered with Defendant Rhodes's prescriptions for insulin from 2011 into January 2014 to treat Plaintiff's diabetes, (b) shows her December 1, 2011 and September 27, 2012 prescriptions for Betamethasone Valerate to treat his rash; and (c) shows her November 1, 2013 prescription for Neurontin, her apparent renewal of Neurontin on January 17, 2014, and her January 5, 2012 prescription for Naproxen, along with her management of

Plaintiff's pain medication.  Therefore, Defendant Rhodes should prevail on her motion for summary judgment, because the record before the Court does not support a conclusion that she was deliberately indifferent to Plaintiff's serious medical needs, much less a "'sufficiently culpable state of mind[,]'" *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 297); in fact, quite the opposite conclusion is warranted.  The record actually demonstrates caution, prudence and a pattern of seeking collaborative advice and consultation.  More to the point, it is indisputable that Defendant Rhodes was not indifferent to Plaintiff's medical needs.

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Fed. R. Civ. P. 72(b)(2) and E.D. Mich. LR 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d

1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections

must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No.

2," *etc.*  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," *etc.*  If the Court determines that any objections are without

merit, it may rule without awaiting the response.


Dated: February 4, 2016          s/Anthony P. Patti
                                 ANTHONY P. PATTI
                                 UNITED STATES MAGISTRATE JUDGE